**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MITCH VELASCO, derivatively on behalf of ADT INC., | |
| Plaintiff, | Case No. _____ |
| vs. | |
| TIMOTHY J. WHALL, JAMES D. DEVRIES, JEFFREY LIKOSAR, P. GRAY FINNEY, MARC E. BECKER, REED B. RAYMAN, MATTHEW H. NORD, ANDREW D. AFRICK, ERIC L. PRESS, LEE J. SOLOMON, STEPHANIE DRESCHER, BRETT WATSON, DAVID RYAN, APOLLO GLOBAL MANAGEMENT, LLC, PRIME SECURITY SERVICES TOPCO PARENT, L.P., APOLLO MANAGEMENT HOLDINGS, L.P., APOLLO MANAGEMENT HOLDINGS, GP, LLC, APOLLO MANAGEMENT, L.P., and APOLLO MANAGEMENT GP, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ADT INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Mitch Velasco ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant ADT Inc. ("ADT" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Timothy J. Whall, James D.

Devries, Jeffrey Likosar, P. Gray Finney, Marc E. Becker, Reed B. Rayman, Matthew H. Nord,

Andrew D. Africk, Eric L. Press, Lee J. Solomon, Stephanie Drescher, Brett Watson and David

Ryan (collectively, the "Individual Defendants") and Apollo Global Management, LLC

("Apollo"), Prime Security Services TopCo Parent, L.P., Apollo Management Holdings, L.P., Apollo Management Holdings GP, LLC, Apollo Management, L.P., and Apollo Management GP, LLC (collectively with Apollo, the "Apollo Defendants," and together with the Individual Defendants and ADT, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of ADT, unjust enrichment, and violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") and violations of Section 20(a) of the Exchange Act.

As for Plaintiff's complaint against the Individual Defendants and the Apollo Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ADT, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by ADT's directors, officers, and controlling shareholders starting on January 19, 2018 and continuing through the present (the "Relevant Period").

2.      ADT is in the electronic home security business. It was taken public for the first time in its over 100-year history in 2012.

3.      ADT was taken private by Apollo in May 2016. Apollo then took the Company public again in January 2018, less than two years later.

4.      In recent years, do-it-yourself ("DIY") home security products from leading technology companies have been entering the home security marketplace, posing a threat to ADT's market share.

5.      ADT has attempted to modernize its offerings to compete with these new threats. For example, ADT Pulse, launched in 2010, allows customers to use their mobile devices to control their security systems, enables real time video viewing, and offers other smart home features.

6.      As of the beginning of 2017, ADT had expended at least $36 million over an approximately 30-month period for a third-party strategic partner, Zonoff, Inc. ("Zonoff"), to develop and market home monitoring products for ADT that could compete with the new DIY products entering the market. Zonoff endeavored to create a software platform (the "Z1 Platform") that used ADT's proprietary data.

7.      Zonoff's cash burn outpaced its development of the Z1 Platform and, despite ADT stepping in multiple times to provide additional resources, home security company Ring was able to capitalize on Zonoff's lack of resources to acquire Zonoff's development team and the Z1 Platform in early 2017. This acquisition put Ring in a position to directly compete with ADT by releasing a low-cost, professionally monitored DIY security system.

8.      In response, ADT sued Ring and Zonoff's former Chief Executive Officer in the Delaware Court of Chancery (the "*Zonoff* Litigation"). After a full trial in September 2017, ADT successfully argued for and obtained a preliminary injunction in November 2017 preventing Ring from selling products using the Z1 Platform.

9.      Despite ADT successfully obtaining a preliminary injunction, the parties to the *Zonoff* Litigation reached a settlement in December 2017, under which ADT forfeited all rights to the Z1 Platform, thus providing Ring with the means to compete directly with ADT.

10.     ADT filed a Registration Statement on Form S-1 with the SEC on September 28, 2017 in order to pursue an initial public offering. After several amendments, the Form S-1 was declared effective on January 18, 2018 and used to conduct an initial public offering of ADT shares (the "IPO"). On January 19, 2018, the Company priced the IPO at $14 per share. A final prospectus was filed on January 22, 2018 (the "Prospectus"). The Prospectus, the Form S-1, and all amendments thereto are referred to collectively herein as the "Registration Statement." The IPO was completed on January 23, 2018.

11.     The Registration Statement made a number of false and misleading statements and omissions of fact necessary to prevent other statements from being misleading.

12.     For instance, the Company failed to disclose the existence of the *Zonoff* Litigation, or any of the effects the settlement might have on its financial results or operations. It also failed to disclose the shifting landscape of the market, in which traditional competitors (telecommunications and cable providers) were being displaced by technology companies like Google, Amazon, and Apple.

13.     Further, the Registration Statement provided unrealistic projections of net income and earnings for the quarter and year ended December 31, 2017, which had concluded at the time of the IPO.

14.     The Registration Statement also failed to provide certain metrics the Company had released prior to going private in 2016, including unit and revenue attrition, quarterly subscriber counts, gross additions by channel and subscriber acquisition cost.

- 4 -

15.     Prior to the IPO, the Company was wholly owned by the Apollo Defendants.

16.     In connection with the IPO, the Company sold 105 million shares of common stock for a price per share to the public of $14.00. ADT received aggregate proceeds of approximately $1.47 billion from the IPO.

17.     Following the IPO, the Apollo Defendants owned approximately 85.6% of the Company's stock. Apollo retains control over ADT, its officers and its directors. The Company is a "controlled company" under NYSE rules and the federal securities laws, and a majority of the Company's directors have been appointed by Apollo.

18.     On January 19, 2018, the media began reporting that the *Zonoff* Litigation had been settled for a one-time payment to ADT of $25 million.

19.     This news placed downward pressure on ADT's stock immediately following the IPO, and shares fell from the $14 IPO price on the very first day of trading, closing at $12.39 on January 19, 2018, a drop of $1.61, or 11.5%, from the IPO price.

20.     The parties to the *Zonoff* Litigation filed a stipulation with the court on February 23, 2018 that vacated the preliminary injunction against Ring. On February 27, 2018, Amazon announced that it had agreed to buy Ring.

21.     On this news, the price of ADT shares fell over 13%, or $1.60 per share, from the closing price on February 26, 2018, closing at $10.55 per share on February 28, 2018.

22.     On March 15, 2018, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2017. The reported results were disappointing, meeting the low end of the net income range estimated in the Registration Statement only due to the one-time tax benefit of tax reforms passed in 2017. Excluding such items, the Company

reported diluted earnings per share of negative $0.06 for the quarter and negative $0.35 for the year.

23.     On this news, the price of ADT shares fell nearly 14.5%, or $1.48 per share, from the closing price on March 14, 2018, closing at $8.73 per share on March 16, 2018.

24.     As of the filing of this Complaint, ADT common stock was trading at around $8.50 per share, approximately a 39% loss in value compared to the IPO price. At no point following the IPO has ADT stock traded at or above $14 per share.

25.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

26.     During the Relevant Period, the Individual Defendants and the Apollo Defendants, in breach of their fiduciary duties owed to ADT, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants and the Apollo Defendants willfully or recklessly made and/or caused the Company to make omissions of material fact regarding, or make false or misleading statements that failed to disclose: (1) the true nature of ADT's relationship with Zonoff and the Z1 Platform; (2) the disclosure of ADT's proprietary information and code to Ring; (3) known uncertainty associated with the *Zonoff* Litigation; (4) ADT had reached a settlement in the *Zonoff* Litigation that would allow Ring to use the Z1 Platform, which was built on trade secrets and technology developed by ADT, to compete directly with ADT; (5) ADT's lack of a material foothold in the DIY home security market; (6) competitive challenges faced by ADT, including that: (i) Ring was currently soliciting ADT's customers by marketing its alarm product as a replacement for ADT Pulse; (ii) Ring's market share grab was not speculative; and (iii) that competition had shifted from cable and telecommunication companies to technology companies like Google, Amazon, and Apple; (7) ADT was not a "partner

of choice for leading technology companies," as evidenced by Amazon's acquisition of Ring shortly after the IPO; (8) attractive growth opportunities for complementary products and services through partnerships with leading technology firms did not exist, nor would any then current partnership expand ADT's presence into new channels; (9) then-existing factors made the IPO more speculative and risky than the Registration Statement disclosed; (10) the Registration Statement mischaracterized as potential risks a number of material trends and results that were then complete; (11) the estimated ranges for the then-complete 2017 fiscal results in the Registration Statement were unrealistic based on the financial results from the then-completed 2017 fiscal year; (12) the Company failed to maintain internal controls; and (13) as a result of the foregoing, ADT's public statements were materially false and misleading at all relevant times.

27.     The Individual Defendants and the Apollo Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

28.     Additionally, in breach of their fiduciary duties, the Individual Defendants and the Apollo Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

29.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times.

30.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 4,203 of the Company's equity securities were

repurchased between January 1 and January 31, 2018 for approximately $58,842.[1] As the Company's stock was actually only worth $7.56 per share during that time, the Company overpaid approximately $27,067 in total.

31.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected ADT, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Legal Officer ("CLO"), nine current members of its board, one former member of its board and Apollo to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Federal Securities Class Action"), and ADT, its CEO, its CFO, its President, nine current members of its board, one former member of its board and the Apollo Defendants to a consolidated securities fraud class action lawsuit pending in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "State Securities Class Action"); the need to undertake internal investigations; losses due to the Company's overpayment of approximately $27,067 for the repurchases of its own stock and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

32.     The Company has been substantially damaged as a result of the Individual Defendants' and Apollo Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, nine of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of one of them in the related Securities Class Action, and of their not being disinterested or independent directors, a majority of the ADT Board of Directors

---

[1] As further explained below, upon information and belief, these repurchases occurred on or after January 19, 2018.

(the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act.

35.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

36.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

37.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

38.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

39.     Venue is proper in this District because ADT and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

40.     Plaintiff is a current shareholder of ADT common stock. Plaintiff has continuously held ADT common stock at all relevant times.

### Nominal Defendant ADT

41.     Nominal Defendant ADT is a Delaware corporation with its principal executive offices at 1501 Yamato Road, Boca Raton, FL 33431. ADT stock trades on the NYSE under the ticker symbol "ADT."

### The Apollo Defendants

42.     Apollo Global Management, LLC is a Delaware limited liability company headquartered in New York, NY. It is a private equity firm that took ADT private in 2016, and public again in January 2018 via the IPO. Apollo sponsored the IPO, and held 641,114,368 shares, representing 100% ownership, prior to the IPO.

43.     Prime Security Services TopCo Parent, L.P. ("TopCo") is a Delaware limited partnership headquartered in Purchase, NY that is affiliated with Apollo.

44.     Apollo Management Holdings, L.P. is a Delaware limited partnership headquartered in New York, NY that is affiliated with Apollo.

45.     Apollo Management Holdings GP, LLC, is a Delaware limited liability company headquartered in New York, NY that is affiliated with Apollo.

46.     Apollo Management, L.P. is a Delaware limited partnership headquartered in Purchase, NY that is affiliated with Apollo.

47.     Apollo Management GP, LLC is a Delaware limited partnership headquartered in Purchase, NY that is affiliated with Apollo.

**Defendant Whall**

48.     Defendant Timothy J. Whall ("Whall") has served as the Company's CEO as a Company director since 2016. According to the Company's Form 10-K filed with the SEC on March 15, 2018 (the "2017 10-K"), on March 8, 2018, Defendant Whall beneficially owned 572,282 shares of the Company's common stock,[2] and 672,351 Class A-2 Units of TopCo, representing 28.6% of outstanding Class A-2 Units. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.52, Defendant Whall owned over $6.0 million worth of ADT stock.

49.     For the fiscal year ended December 31, 2017, Defendant Whall received $1,937,419 in compensation from the Company. This included $705,386 in salary, $254,208 in stock awards, $957,101 in non-equity incentive plan compensation, and $20,724 in all other compensation.

50.     The Company's Schedule 14A filed with the SEC on August 9, 2018 (the "2018 Proxy Statement"), stated the following about Defendant Whall:

> **Timothy J. Whall**[3] is our Chief Executive Officer and a member of our Board of Directors. Mr. Whall has served as Chief Executive Officer of [Prime Security Services Borrower, LLC ("Prime Borrower")] since July 2015 and was also President of Prime Borrower from July 2015 to March 2018. Previously, Mr. Whall served as the President, Chief Executive Officer, and a member of the board of directors of Protection One, Inc. from June 2010 to March 2017. Mr. Whall joined SecurityLink in 1990 as a Service Manager. He served as a General Manager before joining the senior management team in various capacities and ultimately became President and Chief Operating Officer. After SecurityLink was acquired by GTCR in 2000, Mr. Whall continued to serve as President and Chief Operating Officer. Following SecurityLink's sale to Tyco in 2001, Mr. Whall was ADT's Senior Vice President of Business Operations from 2001 to 2004. In 2004, Mr. Whall partnered with GTCR to acquire Honeywell's Security Monitoring division ("HSM"). At HSM he served as President and Chief Operating Officer. Following the sale of HSM to Stanley Black & Decker, Mr. Whall served as Chief Operating Officer of StanleyWorks' Convergent Security Solutions division for one year. In 2008, he

---

[2] Defendant Whall also possessed 311,837 vested options as of that date.
[3] Emphasis in original unless otherwise noted throughout.

left Stanley to pursue opportunities with GTCR. That partnership led to GTCR's acquisition of the Protection One business in June 2010.

**Defendant DeVries**

51.     Defendant James D. DeVries, ("DeVries") has served as the Company's President since May 2016. According to the 2017 10-K, on March 8, 2018, Defendant DeVries beneficially owned 371,459 shares of the Company's common stock,[4] and 100,903 Class A-2 Units of TopCo, representing 4.29% of outstanding Class A-2 Units. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.52, DeVries owned over $3.9 million worth of ADT stock.

52.     For the fiscal year ended December 31, 2017, Defendant DeVries received $1,726,150 in compensation from the Company. This included $513,078 in salary, $466,299 in bonus, $169,087 in stock awards, $563,160 in non-equity incentive plan compensation, and $14,526 in all other compensation.

53.     The Company's 2018 Proxy statement stated the following about Defendant DeVries:

> ***James D. DeVries*** is our President. From May 2, 2016 to September 2017, Mr. DeVries served as The ADT Security Corporation's Executive Vice President and Chief Operating Officer. From December 2014 to May 2016, Mr. DeVries served as Executive Vice President of Brand Operations at Allstate Insurance Company, the second largest personal lines insurer in the United States. During his tenure at Allstate, Mr. DeVries led the operations organization, comprising approximately 7,000 employees in the United States, Northern Ireland, and India, and was responsible for, among other things, customer care centers, outbound and inbound phone sales, procurement, technical support, life underwriting and claims, real estate, administration, and fleet management. From March 2008 to December 2014, Mr. DeVries served as Executive Vice President and Chief Administrative Officer of Allstate, where he was accountable for, among other things, real estate and administration, human resources, and procurement. Prior to joining Allstate in 2008, Mr. DeVries served in various executive and management roles at Principal Financial Group, Ameritech, Quaker Oats Company, and Andrew

---

[4] Defendant DeVries also possessed 155,141 vested options as of that date.

Corporation. Mr. DeVries is a board member of Amsted Industries Inc., a diversified global manufacturer of industrial components serving primarily the railroad, vehicular, and construction and building markets, and a past board member of the Human Resources Management Association of Chicago, the Chicago Public Library Foundation, and the Boys & Girls Clubs of Central Iowa. Mr. DeVries received a bachelor's degree from Trinity College, which is now known as Trinity International University, a master's degree from Loyola University, and a Master of Business Administration from the Kellogg School of Management at Northwestern University.

54.     Upon information and belief, Defendant DeVries is a citizen of Florida.

**Defendant Likosar**

55.     Defendant Jeffrey Likosar ("Likosar") has served as the Company's Executive Vice President, CFO and Treasurer since 2016. According to the 2017 10-K, on March 8, 2018, Defendant Likosar beneficially owned 229,355 shares of the Company's common stock,[5] and 88,795 Class A-2 Units of TopCo, representing 3.78% of outstanding Class A-2 Units. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.52, Likosar owned over $2.4 million worth of ADT stock.

56.     For the fiscal year ended December 31, 2017, Defendant Likosar received $1,903,211 in compensation from the Company. This included $502,974 in salary, $537,078 in bonus, $173,254 in stock awards, $546,425 in non-equity incentive plan compensation, and $143,480 in all other compensation.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Likosar:

> ***Jeffrey Likosar*** is our Executive Vice President, Chief Financial Officer and Treasurer. He is also Prime Borrower's Executive Vice President and Chief Financial Officer (since October 2016) and Treasurer (since March 2018). From February 2014 to September 2016, Mr. Likosar served as CFO of Gardner Denver, a leading global provider of high-quality industrial equipment, technologies, and services to a broad and diverse customer base through a family of highly recognized

---

[5] Defendant Likosar also possessed 176,096 vested options as of that date.

brands. Mr. Likosar was responsible for all aspects of the financial function in this role. From November 2008 to February 2014, Mr. Likosar served in various capacities at Dell Inc., a privately owned multinational computer technology company, including as Chief Financial Officer, End User Computing and Operations, and Vice President of Financial Planning and Analysis and Acquisition Integration. Prior to joining Dell, Mr. Likosar spent most of his career at GE across the Appliances, Plastics, and Aviation Divisions. His roles included Chief Financial Officer of Resins (in GE's Plastics Division) and Chief Financial Officer of Military Systems (in GE's Aviation Division), in addition to various other roles in the Plastics and Appliances Divisions. Mr. Likosar began his career at GE Appliances as an analyst in the Financial Management Program and holds a bachelor's degree in business administration from the Kenan-Flagler Business School at the University of North Carolina at Chapel Hill.

58.     Upon information and belief, Defendant Likosar is a citizen of Florida.

**Defendant Finney**

59.     Defendant P. Gray Finney ("Finney") has served as the Company's Senior Vice President, Chief Legal Officer and Secretary since May 2016. The Company's 2018 Proxy Statement stated the following about Defendant Finney:

> ***P. Gray Finney*** is our Senior Vice President, Chief Legal Officer and Secretary. Previously, Mr. Finney served as the Senior Vice President, General Counsel, and Secretary of Protection One from August 2010 to March 2017. From 2005 to 2010, Mr. Finney was the managing member of Finney Law Firm LLC, a law firm focusing primarily on the electronic security industry and telecommunications. From 1997 to 2003, Mr. Finney served as Senior Vice President, General Counsel, and Secretary of ADT Security Services, Inc. From 1988 to 1996, Mr. Finney was a senior lawyer at Ryder System, Inc., and from 1982 to 1985, he was a Senior Tax Specialist at KPMG LLP. Mr. Finney is licensed to practice law in Alabama, Florida, Mississippi, and Texas, and is also licensed to practice public accountancy in both Alabama and Florida. Mr. Finney holds a B.S. in Accounting and Finance from Florida State University and a J.D. from the University of Miami.

60.     Upon information and belief, Defendant Finney is a citizen of Florida.

**Defendant Africk**

61.     Defendant Andrew D. Africk ("Africk") has served as a Company director since 2016 and is a member of the Audit Committee. According to the 2017 10-K, on March 8, 2018,

Defendant Africk beneficially owned 17,937 Class A-2 Units of TopCo, representing 0.7% of outstanding Class A-2 Units.

62.     For the fiscal year ended December 31, 2017, Defendant Africk received $100,000 in compensation from the Company. This included $50,000 in fees earned or paid in cash, and $50,000 in stock awards. Following the IPO, the Company adopted the following compensation scheme for non-employee directors not appointed by Apollo, including Defendant Africk, as reported in the 2018 Proxy Statement: "an annual cash retainer in the amount of $100,000, paid in substantially equal quarterly installments in arrears, and an annual equity award of restricted stock units with a grant date fair value of approximately $100,000."

63.     The Company's 2018 Proxy Statement stated the following about Defendant Africk:

> ***Andrew D. Africk*** is a member of our Board of Directors. Mr. Africk has also served as a manager of Prime Borrower since its formation in July 2015. Mr. Africk is the founder of Searay Capital LLC, a private investment company. Mr. Africk established Searay Capital in July 2013 after 21 years leading private equity and capital markets investments for Apollo. As a Senior Partner at Apollo, Mr. Africk was responsible for investments in technology and communications, and has over 25 years of experience financing, analyzing and investing in public and private companies. Mr. Africk also currently serves as a director of Suncoke Energy Inc. In the last five years, Mr. Africk has served on the boards of directors for various public companies, including Alliqua Biomedical, Hughes Telematics, Inc., RPX Corporation and STR Holdings, Inc. Additionally, Mr. Africk serves on the Board of Overseers of the University of Pennsylvania School of Engineering and Applied Science, serves on the UCLA Science Board, and is a trustee of the Trinity School in New York City. Mr. Africk graduated summa cum laude, Phi Beta Kappa from UCLA with a B.A. in Economics, magna cum laude from the University of Pennsylvania Law School with a J.D., and with Distinction from the University of Pennsylvania's Wharton School of Business with an MBA.

**Defendant Becker**

64.    Defendant Marc E. Becker ("Becker") has served as a Company director since 2016, and serves as Chairman of the Board. The Company's 2018 Proxy Statement stated the following about Defendant Becker:

> ***Marc E. Becker*** is the chairman of our Board of Directors and a designee of Apollo. Mr. Becker has also served as a manager of Prime Borrower since its formation in July 2015. Mr. Becker is a Senior Partner of Apollo. He joined Apollo in 1996. Prior to that time, Mr. Becker was employed by Smith Barney Inc. within its Investment Banking division. Mr. Becker also serves on the board of directors of Sun Country Airlines and OneMain Financial. During the past five years, Mr. Becker also served as a director of Pinnacle Agriculture Holdings, LLC; Vantium Capital; Affinion Group Holdings, Inc.; Apollo Residential Mortgage, Inc.; CEVA Holdings, LLC; Evertec Group, LLC; Novitex Holdings, Inc.; Realogy Holdings Corp.; and SourceHOV Holdings, Inc. Mr. Becker is actively involved in a number of non-profit organizations and serves as the chairman of the board of both the TEAK Fellowship and Park Avenue Synagogue. Mr. Becker graduated cum laude with a B.S. in Economics from the University of Pennsylvania's Wharton School of Business.

**Defendant Drescher**

65.    Defendant Stephanie Drescher ("Drescher") has served as a Company director since 2017. The Company's 2018 Proxy Statement stated the following about Defendant Drescher:

> ***Stephanie Drescher*** is a member of our Board of Directors and a designee of Apollo. Ms. Drescher has also been a manager of Prime Borrower since December 2017. Ms. Drescher is a Senior Partner at Apollo, having joined in 2004, and is a member of the firm's Management Committee. Prior to joining Apollo, Ms. Drescher was employed by JP Morgan for ten years, primarily in its Alternative Investment group. Ms. Drescher has served on the board of directors of the JP Morgan Venture Capital Funds I and II, JP Morgan Corporate Finance Funds I and II, JP Morgan Private Investments Inc., and Allied Waste. Ms. Drescher is currently on the board of directors of The Young Woman's Leadership Network and the Allen Stevenson School. Ms. Drescher graduated summa cum laude, Phi Beta Kappa from Barnard College of Columbia University and earned her MBA from Columbia Business School.

**Defendant Nord**

66.     Defendant Matthew H. Nord ("Nord") has served as a Company director since 2016. The Company's 2018 Proxy Statement stated the following about Defendant Nord:

> ***Matthew H. Nord*** is a member of our Board of Directors and a designee of Apollo. Mr. Nord has also served as a manager of Prime Borrower since its formation in July 2015. Mr. Nord is a Senior Partner of Apollo. He joined Apollo in 2003. From 2001 to 2003, Mr. Nord was a member of the Investment Banking division of Salomon Smith Barney Inc. Mr. Nord serves on the boards of directors of Exela Technologies, Inc.; Presidio Holdings, Inc.; RCCH HealthCare Partners; and West Corporation. Mr. Nord also serves on the Board of Trustees of Montefiore Health System and on the Board of Overseers of the University of Pennsylvania's School of Design. During the past five years, Mr. Nord also served as a director of Affinion Group Inc.; Constellium N.V.; Evertec Group, LLC; MidCap Financial Holdings, Inc.; Noranda Aluminum Holding Corporation; Novitex Parent, L.P.; and SourceHOV Holdings, Inc. Mr. Nord graduated summa cum laude with a B.S. in Economics from the University of Pennsylvania's Wharton School of Business.

**Defendant Press**

67.     Defendant Eric L. Press ("Press") has served as a Company director since 2016. The Company's 2018 Proxy Statement stated the following about Defendant Press:

> ***Eric L. Press*** is a member of our Board of Directors and a designee of Apollo. Mr. Press has also been a manager of Prime Borrower since May 2016. Mr. Press is a Senior Partner at Apollo. In his 20 years with Apollo, he has been involved in many of the firm's investments in basic industrials, metals, lodging/gaming/leisure, and financial services. Prior to joining Apollo in 1998, Mr. Press was associated with the law firm of Wachtell, Lipton, Rosen & Katz, specializing in mergers, acquisitions, restructurings, and related financing transactions. From 1987 to 1989, Mr. Press was a consultant with The Boston Consulting Group, a management consulting firm focused on corporate strategy. Mr. Press currently serves on the boards of directors of PlayAGS, Inc.; Apollo Commercial Real Estate Finance, Inc.; Princimar Chemical Holdings; RCCH HealthCare Partners; and Constellis Holdings. In the last five years, Mr. Press has served on the boards of directors for Caesars Entertainment Corporation; Verso Corporation; Affinion Group Holdings, Inc.; Noranda Aluminum Holding Corporation; Athene Holding Ltd.; and Metals USA Holdings Corp. Mr. Press graduated magna cum laude from Harvard College with an A.B. in Economics and Yale Law School, where he was a Senior Editor of the Yale Law Journal.

**Defendant Rayman**

68.     Defendant Reed B. Rayman ("Rayman") has served as a Company director since 2016 and is a member of the Audit Committee. The Company's 2018 Proxy Statement stated the following about Defendant Rayman:

> **Reed B. Rayman** is a member of our Board of Directors and a designee of Apollo. Mr. Rayman has also been a manager of Prime Borrower since its formation in July 2015. He is a Principal of Apollo, where he has worked since 2010. Mr. Rayman previously was employed by Goldman, Sachs & Co. in both its Industrials Investment Banking and Principal Strategies groups from 2008 to 2010. Mr. Rayman holds a B.A. in Economics from Harvard University. Mr. Rayman currently serves on the board of directors of New Outerwall, Inc., Coinstar, LLC, Redbox Automated Retail LLC, CareerBuilder, Mood Media Corporation, and ecoATM. He previously served on the board of directors of Verso Corporation.

**Defendant Ryan**

69.     Defendant David Ryan ("Ryan") has served as a Company director since 2016. The Company's 2018 Proxy Statement stated the following about Defendant Ryan:

> **David Ryan** is a member of our Board of Directors and a board designee of certain investors in our indirect parent entities other than Apollo (the "Co-Investors"). Mr. Ryan has also been a manager of Prime Security Services Borrower, LLC, a Delaware limited liability company and indirect wholly-owned subsidiary of the Company ("Prime Borrower"), since May 2016. Mr. Ryan has been an Adviser to Birchtree Fund Investments Private Limited since August 2016. Mr. Ryan retired from his position as President of Goldman Sachs Asia Pacific ex-Japan in December 2013, a position he held since the beginning of 2011, and was a member of the board of directors of Goldman Sachs Australia. Mr. Ryan has over 22 years of experience in various senior roles at Goldman Sachs. Mr. Ryan also serves on the board of directors of Mapletree Investments Pte Ltd.

**Defendant Solomon**

70.     Defendant Lee J. Solomon ("Solomon") has served as a Company director since 2016. The Company's 2018 Proxy Statement stated the following about Defendant Solomon:

> **Lee J. Solomon** is a member of our Board of Directors and a designee of Apollo. Mr. Solomon has also been a manager of Prime Borrower since May 2016. Mr. Solomon is a Senior Partner at Apollo Private Equity having joined in 2009. Prior to that time, Mr. Solomon was an executive in the media industry. Prior

thereto, he served as a Principal at Grosvenor Park, which was a joint venture with Fortress Investment Group. Prior to that, he was the Executive Vice President of Business Affairs for Helkon Media. Mr. Solomon serves on the board of directors of Endemol Shine Group, Redbox Automated Retail LLC, Coinstar, LLC, ecoATM and Mood Media Corporation. He received his MBA from The Stern School of Business at New York University and graduated from the University of Rochester with a B.A. in Economics and Political Science.

**Defendant Watson**

71.     Defendant Brett Watson ("Watson") served as a Company director from 2016 to July 25, 2018. The Company's 2017 10-K stated the following about Defendant Watson:

> **Brett Watson** is a member of our board of directors and a designee of the Koch Investor. Mr. Watson has also been a manager of Prime Borrower since May 2016. Mr. Watson is a Senior Managing Director with Koch Equity Development LLC. Mr. Watson also serves on the board of directors of the parent companies of Infor, Flint Group and Transaction Network Services. Mr. Watson holds a B.S. and M.B.A. from Binghamton University. We anticipate that Mr. Watson will resign from our board of directors after we redeem in full the outstanding Koch Preferred Securities and pay the related redemption premium and other related amounts.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

72.     By reason of their positions as officers and directors of ADT, and/or as fiduciaries and controlling shareholders of ADT, and because of their ability to control the business and corporate affairs of ADT, the Individual Defendants and Apollo Defendants owed ADT and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ADT in a fair, just, honest, and equitable manner. The Individual Defendants and Apollo Defendants were and are required to act in furtherance of the best interests of ADT and its shareholders so as to benefit all shareholders equally.

73.     Each director, officer, and controlling shareholder of the Company owes to ADT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74.    The Individual Defendants and Apollo Defendants, because of their positions of control and authority as directors, officers and/or controlling shareholders of ADT, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

75.    To discharge their duties, the officers and directors of ADT were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76.    Each Individual Defendant and Apollo Defendant, by virtue of his or her position as a director, officer, and/or as a controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants and Apollo Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and/or controlling shareholders of ADT, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants and Apollo Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants and Apollo Defendants who were also officers, directors, and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants and Apollo Defendants who collectively comprised ADT's Board at all relevant times.

77.    As senior executive officers, directors, and/or controlling shareholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the

Exchange Act and traded on the NYSE, the Individual Defendants and Apollo Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78.     To discharge their duties, the officers and directors of ADT were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ADT were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, Delaware, the United States, and pursuant to ADT's own internal guidelines, including its Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how ADT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ADT and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ADT's operations would comply with all laws and ADT's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

79.    Each of the Individual Defendants and Apollo Defendants further owed to ADT and the shareholders the duty of loyalty requiring that each favor ADT's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.    At all times relevant hereto, the Individual Defendants were the agents of each other and of ADT and were at all times acting within the course and scope of such agency.

81. Because of their advisory, executive, managerial, and directorial positions with ADT, each of the Individual Defendants and Apollo Defendants had access to adverse, non-public information about the Company.

82. The Individual Defendants and Apollo Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ADT.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83. In committing the wrongful acts alleged herein, the Individual Defendants and Apollo Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Apollo Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants and Apollo Defendants further aided and abetted and assisted each other in breaching their respective duties.

84. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants and Apollo Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

85. The Individual Defendants and Apollo Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and

violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants and Apollo Defendants who are directors of ADT was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

86.     Each of the Individual Defendants and Apollo Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Apollo Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ADT and was at all times acting within the course and scope of such agency.

### ADT'S BOARD GOVERNANCE PRINCIPLES

88.     The Company's Board Governance Principles notes that directors are expected to comply with the Code of Conduct, stating, in relevant part:

 ADT's company culture is built on the premises that the company seeks to draw the best from its employees, and that ***every employee, without exception, is responsible for the conduct and success of the enterprise. This includes full, accurate, candid, and timely disclosure of information, and compliance with all laws and regulatory standards***. Employee responsibilities are elaborated in our Code of Conduct. The Board is responsible for setting the ethical tenor for management and the company. That ethical tenor works on the expectation that employees understand where the lines are that they should not cross and stay widely clear of those lines. ***The Code of Conduct is reviewed periodically by all directors, officers and other employees, and they affirm in writing that they understand it and are fully in compliance with it***. All senior executives, including the chief

executive, are evaluated and compensated in part on proactively promoting integrity and compliance.

(Emphasis added.)

## ADT'S CODE OF CONDUCT

89.     The Company's Code of Conduct (the "Code of Conduct" or the "Code") states that "ADT expects all team members and contractors of the company to comply with the Code."

90.     The 2018 Proxy Statement states that the Code of Conduct "applies to all of our directors, officers, and employees."

91.     The Code of Conduct states, regarding reporting violations the code, in relevant part, that "[i]f you become aware of a potential violation of the Code, it is your responsibility to report it."

92.     Regarding "Conflicts of Interest," the Code of Conduct states, in relevant part:

Conflicts of interest exist when your personal interests or activities interfere, or appear to interfere, with the interests of the company. A conflict of interest affects your judgment, objectivity, or loyalty to ADT. Such conflicts can arise in many different situations and relationships, and are not always obvious. ***It is important that your decisions and actions be based on ADT's business needs – not what serves your own personal interests or those of a third party***. To make certain that we act in ADT's best interests, team members are required to disclose any actual or potential conflict of interest. Even if you do not have an actual conflict, others may think you do. To avoid even the appearance of a conflict, seek guidance from your manager, a human resources representative, the ADT Ethics Line, or the ADT Ethics Office. The company will work with you to determine appropriate action.

(Emphasis added.)

93.     Regarding "Asset Protection," the Code of Conduct states:

We create value for the company by using our expertise and company assets. We commit to use and protect company assets appropriately and productively. Company assets include physical property, financial assets, proprietary

information, data, records, and intellectual property such as brands, inventions and copyrights. In dealing with ADT's assets, follow these guidelines:

• Use your best judgment when procuring assets for the company

• Use care when working with company assets

• Ensure company assets are protected from misuse or theft

• Only share company assets outside the company with prior authorization

• Comply with security requirements to safeguard physical property and other assets.

94.     The Code of Conduct provides, regarding "Recordkeeping and Reporting" in relevant part:

As a team member, each of us is obligated to uphold all relevant financial accounting and reporting standards and regulations. Our financial records must be:

o Complete, accurate, and timely

o Properly supported and documented

o Fair and objective

o Shared only with proper authorization.

95.     The Individual Defendants violated the Code of Conduct by making and/or causing the Company to make the false and misleading statements and omissions discussed herein.

**INDIVIDUAL DEFENDANTS' AND APOLLO DEFENDANTS' MISCONDUCT**

**Background**

96.     Founded in 1874, ADT is one of the country's oldest security brands. In the U.S. and Canada, the Company is the leading provider of professionally-monitored security, home and business automation, and related monitoring services, including burglary, video, access control, fire alarms, and medical alert solutions.

- 26 -

97.    ADT employs approximately 18,000 people, and, as of September 30, 2017, served approximately 7.2 million customers representing a 30% market share - five times greater than its closest competitor.

98.    In response to adapting customer needs and new technologies, ADT has introduced new products and services over the past decade. For example, ADT Pulse was launched in 2010, allowing customers to use their mobile devices to control their security systems and thermostats, as well as enabling real time video viewing of their properties.

99.    The vast majority – over 90% – of ADT's revenues are from recurring, contractually-committed monthly payments for monitoring the security systems that it sells and installs at a loss. Monthly prices range from $30 to $60 per month.

100.    In addition to the costs of the systems and their installation, ADT must provide scheduled maintenance services, preventative maintenance services, and services on demand: a very costly business model.

101.    Despite ADT's attempts to keep up with the digital age, in particular the proliferation of the "Internet-of-Things" ("IoT"), its business model is being disrupted by the emergence of mobile and cyber security offerings.

102.    One such emerging competitor, Ring, introduced a video doorbell product in 2013 that allowed users to monitor their home security through their cellular telephone.

103.    In subsequent years, Ring has introduced more self-monitored home security products, including smoke alarms, floor sensors, home alarms, and security cameras. These products are easily installed, can easily be moved to another property, and are much less costly than ADT's offerings. By 2017, Ring had over 1 million users.

104.    At the time of ADT's IPO, Ring was rumored to have been considering its own IPO. In reality, Ring was actually engaged in private discussions to be acquired by Amazon.

105.    In response to competitive threats and changing consumer preferences, ADT introduced new products and software platforms to the market.

106.    ADT Canopy, launched in 2016, offered a contract free, month-to-month subscription service integrating ADT's monitoring capabilities into a selection of third-party smart home products.

107.    In October 2017, ADT partnered with Samsung to introduce the Samsung SmartThings ADT home security system, the goal of which was to provide an easy, flexible smart home solution that allowed consumers to select from and self-install a variety of home security products that could then be professionally monitored by ADT. Although this platform was designed to work with a number of products from a variety of manufacturers, including the Ring video doorbell, ADT Canopy-compatible devices were limited to those manufactured by Samsung, Honeywell, NETGEAR and Apple HomeKit by the time of the IPO.

**Zonoff Collaboration and Litigation**

108.    ADT also sought to introduce its own "out-of-the-box" security system to limit its reliance on third party relationships with hardware manufacturers willing to include ADT-based monitoring as an add-on. In order to effectuate this, ADT partnered with Zonoff, a designer of home automation solutions (both hardware and software), to develop new security monitoring products and services.

109.    ADT and Zonoff entered into a collaboration agreement in November 2014 to develop a new software platform for ADT incorporating confidential, proprietary information from

ADT (specifically ADT's confidential knowledge of professional monitoring) and ADT's specifications for the final product. The product of the collaboration was called the "Z1 Platform."

110.    The Z1 Platform was to be integrated into two new ADT offerings: (1) a replacement to the ADT Pulse system that had been licensed from another company and was suffering from stability and scalability issues, impinging on ADT's ability to add new customers to the platform; and (2) a home security and alarm retail product to be installed by consumers and monitored by ADT.

111.    ADT invested in Zonoff through a stock purchase and secured loan. The loan was secured by a first priority lien and a security interest in all of Zonoff's assets and intellectual property rights, including the Z1 Platform. The agreement prohibited Zonoff and Zonoff employees from using ADT's confidential information to "(i) compete directly or indirectly with [the Company]; or (ii) interfere with any actual or proposed business of [the Company]." It also obliged Zonoff and Zonoff employees not to "disclose or otherwise make available any of the Confidential Information to anyone," except individuals "who need to know the Confidential Information for the purpose of meeting [Zonoff's] obligations under" the agreement. The agreement also gave ADT the right to demand the "return or destruction" of the Z1 Platform.

112.    The agreement between Zonoff and ADT provided that ADT would own the Z1 Platform and Zonoff would retain the rights to its pre-existing technology that went into developing the platform.

113.    Zonoff quickly ran in to financial problems, and began to have difficulty paying certain third-party development costs by April 2015. Zonoff turned to ADT, and ADT agreed to satisfy certain substantial outstanding third-party development costs for Zonoff.

114.     Further delays and missed milestones plagued development of the Z1 Platform. These setbacks led Zonoff to request additional support from ADT in October 2015, February 2016, July 2016, and November 2016.

115.     ADT provided financial support following each request. However, in November 2016 ADT demanded a subordinated security interest in Zonoff's assets and for Zonoff to agree to a contingency plan escrow agreement to ensure ADT's ability to access all of the Z1 Platform should certain trigger events occur, such as the cessation of Zonoff's operations. This financing was intended to carry Zonoff through the closing of a potential acquisition by Honeywell that had been under negotiation (although that acquisition was ultimately never consummated).

116.     Despite continuing financial support from ADT, Zonoff's cash on hand proved to be insufficient. Zonoff informed ADT on or about December 28, 2016 that it only had enough cash to continue operations for another month in the best-case scenario. On or about January 17, 2018, Zonoff again reached out to ADT, informing the Company that it would likely run out of funds to support its operations if the Honeywell acquisition was not completed.

117.     By January 17, 2017, ADT had spent $36 million on the collaboration agreement with Zonoff. Zonoff's precarious financial position placed in peril: (1) the development of the Z1 Platform; (2) the repayment of ADT's loans to Zonoff; and (3) ADT's substantial investment in the development of the Z1 Platform.

118.     Zonoff was not inclined to allow itself to be destroyed by these financial problems. Without the knowledge of ADT, Zonoff CEO Michael Harris ("Harris") began negotiating in January 2017 for positions for himself and seventeen other Zonoff employees with Ring. The deal was centered on Ring's acquisition of Zonoff's development team and the Z1 Platform.

- 30 -

119.    On March 2, 2017, Zonoff terminated all of its employees. Harris obtained a senior-level position at Ring. Most of Zonoff's employees also obtained positions at Ring continuing development of the Z1 Platform for Ring's benefit. Ring leased Zonoff's former office spaces and headquarters, and obtained the Z1 Platform.

120.    Also on March 2, 2017, ADT obtained access credentials to the Z1 Platform software environment and documentation that had been placed in escrow, materials to which ADT became entitled on the cessation of Zonoff's business.

121.    Upon accessing these materials, ADT learned of Harris' deal with Ring and resulting transfer of the Z1 Platform to Ring. ADT also learned, for the first time, that Ring was developing a product using the Z1 Platform to directly compete with ADT in the professionally-monitored home security market. Ring had begun plans to develop such a product in 2016, and had engaged Zonoff to create a platform for its DIY professionally monitored alarm. Thus, Ring's new product was essentially the same one that ADT had partnered with Zonoff to create.

122.    Ring lacked prior experience with the professionally monitored home security market, which is highly regulated. By obtaining the Z1 Platform, Ring gained the opportunity to jump start its entry into that market without expending the time and resources necessary to build a product from the ground up. As Ring's CEO later testified, the competitive edge of being the first to launch such a product was worth "a billion dollars" as it would both expand the security market and take market share from established professional monitoring providers.

123.    Not only would Ring have the first mover advantage, its system was priced at $199 with a $10 monthly charge for monitoring, significantly below ADT's $30-60 per month price point.

124.    ADT initiated the *Zonoff* Litigation against Harris and Ring in the Delaware Court of Chancery on or about April 27, 2017, alleging misappropriation of trade secrets, tortious interference with contractual relationship, conversion, and fraudulent transfer. As relief, ADT sought damages and the return of the Z1 Platform.

125.    In a Verified Complaint filed on May 3, 2017 in the *Zonoff* Litigation, ADT emphasized that the trade secrets at issue were material to ADT, and, in Ring's possession, posed a significant competitive threat to ADT.

126.    The Verified Complaint further stated that: "Ring wrongfully maintains possession of the Z1 Platform, a product designed and develop for ADT and in which ADT invested substantial funds, to use in competition with ADT." The Verified Complaint further alleged that "Ring's continued possession and use of the Z1 Platform is causing and will continue to cause ADT irreparable injury, including, but not limited to, the material and substantial impairment of ADT's rights and interest in and to the Z1 Platform [and] the protection of its trade secrets therein . . ."

127.    Following the close of discovery in the *Zonoff* Litigation, Ring and Harris offered to settle the claims with ADT for $12.5 million. ADT rebuffed the offer and the case was tried between September 18 and 21, 2017.

128.    On October 9, 2017, following the close of the trial, ADT sought a preliminary injunction to prevent Ring from selling any products based on the Z1 Platform. The briefing on the motion further demonstrated the materiality of loss of the Z1 Platform to ADT.

129.    Ring announced the "Ring Protect" on October 2, 2017, "a home security system with window sensor and a motion detector that has the ability to be professionally monitored."

- 32 -

130.    As ADT stated, "Ring is competing directly and explicitly with ADT, using the improperly required source code as the foundation of a new product." As represented by ADT in court filings:

> The allegation that this product competes with ADT is not speculative, it is expressly confirmed by Ring's own marketing materials. Ring not only compares its product to ADT's Pulse offering, but specifically touts the savings consumers can realize by using "Ring Protect" rather than Pulse.

131.    According to ADT, the comparison of Ring Protect to ADT Pulse "is no coincidence": "Ring's product is using the software platform specifically developed by ADT and Zonoff for Pulse." ADT's concern was heightened given "[t]he emerging nature of the DIY home security market."

132.    ADT further asserted that Ring "received a two-year, $50 million head start on its entry into the professionally monitored segment of the home security industry" as "a direct result of Ring's wrongful taking of ADT's source code." Thus, "Ring [was] able to skip over the trials and errors, the resources consumed, and hours devoted by companies like ADT to put out a competing product in a fraction of the time, using technology developed and paid for by ADT."

133.    Oral argument was held on the motion for a preliminary injunction on November 2, 2017. At the hearing, counsel for ADT explained to the Court the irreparable harm inflicted upon ADT as a result of the Ring's Zonoff transaction. He explained:

> This is a new field, a new product category, professionally monitored DIY home security tied into the smart home. Mr. Siminoff testified he believes Nest, which is Google, jumped into the pace specifically because they heard Ring was getting into the space. This is the Christmas season where people are going to establish market share. He who comes out in January with market share is operating from the high ground and is getting brand recognition. That means its not a one-to-one issue; its not as if Ring gets a sale, my client lost a sale. Its someone who is going to get a sale, someone who is going to get elevated with brand recognition, and someone is going to get market share, and that's very hard to claw back. That's not easily compensated or even determined from the compensation standpoint. Had this PI

hearing been in July, Ring would never have released its product. It released it because has to get on the shelves for the holidays.

134.    The court granted ADT a preliminary injunction prohibiting Ring from selling products based on the Z1 Platform until the adjudication was complete, finding it reasonably probable that Ring was improperly using the Z1 platform. The court stated, in relevant part:

> I think there is irreparable harm to ADT . . . I think it is reasonably probable that Ring should not have been using the escrow materials for the purposes they were using them for.
>
> So, its one thing to say – and I agree – that ADT doesn't have a right to avoid competition. But its another thing when that competitor has emerged by virtue of the misuse of someone else's property, which is what there's a reasonable probability of success and good reason to think happened here.
>
> Given that predicate, I think there is irreparable harm to ADT.

135.    Despite the ruling on the preliminary injunction in ADT's favor, ADT, Harris, and Ring informed the Delaware Court of Chancery on December 15, 2017 (prior to receiving a ruling on the merits) that the parties had reached a settlement in principle after a December 7, 2017 mediation. A letter to the court did not disclose the terms of the settlement.

136.    The parties again wrote the court on January 19, 2018, the day of ADT's IPO, indicating that despite having made "significant progress," the parties were still in the process of finalizing the terms of the settlement and believed they were "close" to finalizing a settlement. This letter did not disclose the terms of the settlement.

137.    The parties to the *Zonoff* Litigation filed a stipulation on February 23, 2018 informing the Court that the settlement was finalized. The stipulation did not disclose the terms of the settlement, but vacated the preliminary injunction against Ring that ADT had requested and obtained in November 2017.

138.    Media sources reported that the settlement involved a $25 million payment to ADT, and that Ring would be able to take its professionally monitored DIY security product to market with the Z1 Platform.

139.    Indeed, in June 2018, Ring launched the Ring Alarm (formerly named the Ring Protect) at a price point of $199 for the system and $10 per month for professional monitoring ($100 for 12 months).

140.    As a result, ADT's counsel's words regarding the DIY professionally-monitored home security market at the preliminary injunction hearing proved prescient:

> Ring got to [the professionally monitored DIY home security business] table without having to spend two years developing the software, without having to spend the $50 million that it, quite frankly, did not have, and so it is out of place to get a competitive advantage at the right time at the right place because it stole [ADT's] software. That's timing, and that's also market share.

**Registration Statement Requirements**

141.    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) & (b), require that a proxy statement disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

142.    Regulation S-K requires, as noted in the instructions to Item 303(a), that the registration statement disclose and "focus specifically" on material events and uncertainties that would cause the historical financial information about the Company not to be necessarily indicative of future operating results. This includes "matters that would have an impact on future operations and [matters that] have not had an impact in the past." The instructions state, in relevant part:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial***

*information not to be necessarily indicative of future operating results* or of future financial condition. *This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past*, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

(Emphasis added.)

143.    The SEC issued an interpretive release to Item 303 of Regulation S-K on May 18, 1989 (the "1989 Interpretive Release"). The 1989 Interpretive Release clarifies that there is a duty to disclose where a demand, trend, commitment, uncertainty or event is both presently known to management and reasonably likely to have a material effect on either the registrant's financial condition or results of operation. The 1989 Interpretive release states, in relevant part:

Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. *More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant*, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required*.[6]

144.    On December 19, 2003, the SEC issued an interpretive release to Item 303 of Regulation S-K, with an effective date of December 29, 2003 (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part;

---

[6] *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *15, *18 (May 18, 1989) (Emphasis added, footnote omitted).

As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.[7]

145.    Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503 requires, in the "Risk Factor" section of the Registration Statement, a "discussion of the most significant factors that make the offering speculative or risky." Each risk factor must adequately describe the risk.

146.    Item 101 of SEC Regulation S-K, 17 C.F.R. § 229.101(c)(x) requires the disclosure of competitive conditions:

> *Competitive conditions in the business involved including, where material, the identity of the particular markets in which the registrant competes, an estimate of the number of competitors and the registrant's competitive position, if known or reasonably available to the registrant*. Separate consideration shall be given to the principal products or services or classes of products or services of the segment, if any. Generally, the names of competitors need not be disclosed. The registrant may include such names, unless in the particular case the effect of including the names would be misleading. Where, however, the registrant knows or has reason to know that one or a small number of competitors is dominant in the industry it shall be identified. *The principal methods of competition (e.g., price, service, warranty or product performance) shall be identified, and positive and negative factors pertaining to the competitive position of the registrant, to the extent that they exist, shall be explained if known or reasonably available to the registrant*.

(Emphasis added.)

**Materially False and Misleading Statements**

147.    ADT filed with the SEC a confidential draft Registration Statement on Form S-1 on September 28, 2017. After a series of comments from the SEC emphasizing the importance of adequately discoing material trends and risk factors, and amendments by ADT, this Form S-1 formed the basis for the IPO.

---

[7] *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

148.   The final amendment to the Registration Statement was filed on January 17, 2018, registering 105 million shares of ADT common stock for sale, signed by Defendants Whall, Likosar, Becker, Rayman, Nord, Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney.

149.   The Registration Statement stated that the Company had undergone a "transformation" resulting in a "'New ADT' with a substantially improved customer experience and operating culture." This "New ADT" "combined the brand, history, and scale of legacy ADT with [enhanced] customer service and operational excellence . . . to create an industry leader with the broadest portfolio, largest scale, and leading financial and operating metrics." The Registration Statement noted that a "new management team has notably improved customer retention, reduced customer acquisition costs and improved profitability" and that "these strategies have already delivered significant improvements in operational and financial results."

150.   The Registration Statement lauded several comparative metrics, including the following:

> **Improved Operational and Financial Metrics.** Comparing pre-acquisition Legacy ADT (as defined below) for its fiscal year ended September 25, 2015 to post-acquisition Legacy ADT (as defined below) in the trailing twelve-month period ended September 30, 2017, we reduced gross customer revenue attrition from 16.5% to 13.9%. In addition, in comparing pre-acquisition Legacy ADT for its fiscal year ended September 25, 2015 to the post-acquisition Company in the trailing twelve-month period ended September 30, 2017, we increased Adjusted EBITDA margins as a percentage of monitoring and related services revenues from 54.1% to 57.6%, and we reduced the customer revenue payback period from 2.7 years to 2.5 years. We also reduced total net capital expenditures as a percentage of Adjusted EBITDA and improved our cash flow.

* * *

> **Reduced Customer Revenue Attrition.** As a result of a combination of (i) increased discipline related to the credit quality of the new customers we acquire, including the expansion of credit scoring metrics to substantially all new customers, (ii) improved customer service, especially in the speed of our responsiveness in our call centers and field operations, and (iii) a technology-driven product and service offering that increases customer contact and allows us to

provide tailored offerings, we have improved annual customer revenue attrition at legacy ADT by more than two and a half percentage points since the consummation of the ADT Acquisition. Customer revenue attrition is one of the most important drivers of value creation in security monitoring businesses, and based on our estimates every one percentage point improvement in attrition frees up more than $100 million of cash flow we would otherwise need to spend to replace those lost customers

151.    The Registration Statement also provided "preliminary estimated ranges" for the Company's financial results for the year ended December 31, 2017 ("FY 2017"). These included a range for FY 2017 net income of between $86.8 million to $550.8 million, and the Registration Statement asserted that "[w]e have presented preliminary estimated ranges of certain of our financial results [] for the year ended December 31, 2017 *based on information currently available to management*."[8]

152.    The Registration Statement further warned investors of potential risks, which might adversely affect the Company, while such risks had already materialized at the time of the IPO. For example, the Registration Statement asserted, in relevant part:

> ***U.S. federal income tax reform could adversely affect us.***
>
> On December 22, 2017, President Trump signed into law H.R. 1, originally known as the "Tax Cuts and Jobs Act," . . . The new legislation, among other things, includes changes to U.S. federal tax rates, imposes significant additional limitations on the deductibility of interest, allows for the expensing of capital expenditures, and puts into effect the migration from a "worldwide" system of taxation to a territorial system. . . . Our net deferred tax assets and liabilities will be revalued at the newly enacted U.S. corporate rate, and the impact will be recognized in our tax benefit for the year ending December 31, 2017. **The impact on the year ended December 31, 2017** and on future years **may be material to the consolidated financial statements**. We continue to examine the impact this tax reform legislation may have on our business. . . .

(Bold & italic subheading in original, bold emphasis added). The Registration Statement further asserted that "our actual results for the year ended December 31, 2017 *may* differ materially from

---

[8] Emphasis added.

the preliminary estimated financial results."[9]

153.    Regarding future investments in new business, the Registration Statement failed to disclose that the Company's investment in Zonoff and the Z1 Platform had already resulted in a loss and failure to bring any new product to market, stating, in relevant part:

> ***We have and will continue to invest in new businesses, services, and technologies outside the traditional security and interactive services market, which is inherently risky, and could disrupt our current operations.***
>
> We have invested and will continue to invest in new businesses, products, services, and technologies beyond traditional security and interactive services. Our investments may involve significant risks and uncertainties, including capital loss on some or all of our investments, insufficient revenues from such investments to offset any new liabilities assumed and expenses associated with these new investments, distraction of management from current operations, and issues not identified during pre-investment planning and due diligence that could cause us to fail to realize the anticipated benefits of such investments and incur unanticipated liabilities. Since these investments are inherently risky, these new businesses, products, services, and technologies may not be successful and as a result, may materially adversely affect our reputation, financial condition, and results of operations.

154.    Further, the Registration Statement failed to mention *Zonoff* Litigation in any way. Instead, the Registration Statement noted that:

> ***The Company is subject to various claims and lawsuits in the ordinary course of business***, including from time to time, contractual disputes, employment matters, product and general liability claims, claims that the Company has infringed on the intellectual property rights of others, claims related to alleged security system failures, and consumer and employment class actions. In the ordinary course of business, the Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with such formal and informal inquiries, the Company receives numerous requests, subpoenas, and orders for documents, testimony, and information in connection with various aspects of its activities. The Company has recorded accruals for losses that it believes are probable to occur and are reasonably estimable. ***While the ultimate outcome of these matters cannot be predicted with certainty, the Company believes that the resolution of any such proceedings (other than matters specifically identified below), will not have a material adverse effect on its***

---

[9] Emphasis added.

*financial position, results of operations, or cash flows*.

(Emphasis added.) The cases identified in the section below this quote did not include the *Zonoff*

Litigation.

155.    The Registration Statement failed to disclose the potential material adverse effect

of the *Zonoff* Litigation, its settlement, or Ring's resultant entry into the professionally-monitored

security industry was having, or would in the future have, on the Company's financial results,

operations, and reputation, stating instead:

> *we are currently and may in the future become subject to legal proceedings* and
> commercial or contractual disputes. *These are typically claims that arise in the
> normal course of business including*, without limitation, commercial or
> contractual disputes with our suppliers, *intellectual property matters*, third party
> liability, including product liability claims and employment claims. *There is a
> possibility that such claims may have a material adverse effect on our results of
> operations that is greater than we anticipate* and/or negatively affect our
> reputation.

(Emphasis added.)

156.    Regarding intellectual property rights, the Registration Statement misleadingly

stated, in relevant part:

> *Infringement of our intellectual property rights could negatively affect us.*
>
> We rely on a combination of patents, copyrights, trademarks, trade secrets,
> confidentiality provisions, and licensing arrangements to establish and protect our
> proprietary rights. We cannot guarantee, however, that the steps we have taken to
> protect our intellectual property rights will be adequate to prevent infringement of
> our rights or misappropriation of our intellectual property or technology . . . **while
> we enter into confidentiality agreements with certain of our employees and
> third parties to protect our intellectual property, such confidentiality
> agreements could be breached or otherwise may not provide meaningful
> protection for our confidential information, trade secrets and know-
> how related to the design, manufacture, or operation of our products and
> services. If it becomes necessary for us to resort to litigation to protect our
> intellectual property rights, any proceedings could be burdensome and costly,
> and we may not prevail. Further, adequate remedies may not be available in
> the event of an unauthorized use or disclosure of our confidential information,
> trade secrets, or know-how. If we fail to successfully enforce our intellectual**

> **property rights, our competitive position could suffer, which could materially adversely affect our business, financial condition, results of operations, and cash flows.**

(Bold & italic subheading in original. Bold emphasis added.)

157.    Regarding "Competition," the Registration Statement omitted the threat of new market entrants such as Ring, Google, Apple, Amazon, and DIY services, stating, in relevant part:

> Technology trends are creating significant change in our industry. Innovation has lowered the barriers to entry in the interactive services and automation market, and new business models and competitors have emerged. We believe that a combination of increasing customer interest in lifestyle and business productivity and technology advancements will support the increasing penetration of the interactive services and automation industry. ***We are focused on extending our leadership position in the monitored security industry while also growing our share of the fast-growing interactive automation industry.*** The security systems market in the United States and Canada remains highly competitive and fragmented, with a number of major firms and thousands of smaller regional and local companies. The high fragmentation of the industry is primarily the result of relatively low barriers to entering the business in local geographies and the availability of wholesale monitoring (whereby smaller companies outsource their monitoring to operations that provide monitoring services but do not maintain the customer relationship). ***We believe that our principal competitors within the security systems market are Johnson Controls International plc., Vivint, Inc., Stanley Security Solutions, a subsidiary of Stanley Black and Decker, MONI, a subsidiary of Ascent Capital Group, Inc. and Comcast Corporation***.

(Emphasis added.)

158.    The Registration Statement instead touted such competitive threats from new market entrants such as Ring, Google, Apple, Amazon, and other DIY services as "growth opportunities," stating, in relevant part:

> **Attractive Growth Opportunities. *We are well-positioned to drive growth in our residential channel by leveraging ADT's brand and scale and our renewed focus on the customer experience.*** We are also well-positioned to drive growth in our commercial and multi-site customer channels as a result of these factors coupled with Protection One's strong existing commercial and multi-site customer base and expertise. In addition, we ***have attractive growth opportunities for complementary products and services, including through partnerships with leading technology firms such as Honeywell, Samsung, Amazon, Life 360, and Cisco Meraki. These partnerships collectively extend our presence to new channels (including DIY,***

- 42 -

> *retail, and e-commerce) and new and complementary offerings in automation,*
> *cyber security, and mobile on-the-go applications*.

(Bold subheading in original, bold & italic emphasis added.)

159.   The Registration Statement continued to tout such third parties as potential business

partners, as opposed to competitors, stating:

> We expect a growing opportunity to expand from our core business to drive growth
> in adjacent markets, capitalizing on our core expertise and monitoring and service
> capabilities—along with our brand strength and high degree of customer trust—to
> expand our addressable market. We intend to pursue additional opportunities in
> adjacent markets, including through potential selective acquisitions.

160.   Regarding "growth areas," the Registration Statement stated, in relevant part:

> *We have made substantial progress in the development of numerous potential*
> *growth areas for our Company, including*: leveraging Protection One's history in
> the commercial market to continue building a world-class commercial security
> business; expanding our total addressable market by leveraging the ADT brand to
> bring security monitoring to innovative new customer experiences and offerings,
> evidenced by progress in developing cyber security and our new on-the-go mobile
> offerings; and *continuing to take advantage of our status as a "partner of choice"*
> *to leading technology companies, evidenced by our recently announced*
> *partnership with Amazon*.

(Emphasis added.)

161.   Regarding "Risk Factors," the Registration Statement misleadingly described the

following as potential risks:

> Participating in this offering involves substantial risk. Our ability to execute our
> strategy also is subject to certain risks. *The risks described under the heading*
> *"Risk Factors" immediately following this summary may cause us not to realize*
> *the full benefits of our competitive strengths or may cause us to be unable to*
> *successfully execute all or part of our strategy*. Some of the more significant
> challenges and risks we face include the following:
>
> * * *
>
> • *our ability to successfully offer, develop, enhance, and/or introduce*
>
>    *products that keep pace with evolving technology related to our business*
>
>    . . .

- 43 -

(Emphasis added.)

162.    Regarding competition from DIY products, the Registration Statement asserted the

following, without mentioning Ring or the *Zonoff* Litigation:

> ***We sell our products and services in highly competitive markets, including the home automation market, which may result in pressure on our profit margins and limit our ability to maintain or increase the market share of our products and services.***
>
> * * *
>
> **We also face potential competition from DIY products**, which enable customers to self-monitor and control their environments without third-party involvement through the Internet, text messages, emails, or similar communications, but with the disadvantage that alarm events may go unnoticed. **Some DIY providers may also offer professional monitoring with the purchase of their systems and equipment without a contractual commitment, which may be attractive to some customers and put us at a competitive disadvantage. Other DIY providers may offer new IoT devices and services with automated features and capabilities that may be appealing to customers**. Shifts in customer preferences towards DIY systems could increase our attrition rates over time and the risk of accelerated amortization of customer contracts resulting from a declining customer base. **It is possible that one or more of our competitors could develop a significant technological advantage over us that allows them to provide additional service or better quality service or to lower their price, which could put us at a competitive disadvantage. Continued pricing pressure, improvements in technology, and shifts in customer preferences towards self-monitoring or DIY could adversely impact our customer base and/or pricing structure and have a material adverse effect on our business, financial condition, results of operations, and cash flows**.

(Bold & italic subheading in original. Bold emphasis added.)

163.    The Registration Statement further misleadingly described risks associated with the

entrance of competing technology into the market that could in the future materially and adversely

affect the Company's growth as potential, stating, in relevant part:

> ***Our future growth is dependent upon our ability to keep pace with rapid technological and industry changes in order to develop or acquire new technologies for our products and service introductions that achieve market acceptance with acceptable margins.***
>
> Our business operates in markets that are characterized by rapidly changing

technologies, evolving industry standards, potential new entrants, and changes in customer needs and expectations. For example, a number of cable and other telecommunications companies and large technology companies with home automation solutions offer interactive security services that are competitive with our products and services. **If these services gain greater market acceptance and traction, our ability to grow our business, in particular our ADT Pulse and other interactive service offerings, could be materially and adversely affected**. Accordingly**, our future success depends in part on our ability to accomplish the following**: identify emerging technological trends in our target end-markets; develop, acquire, and maintain competitive products and services that capitalize on existing and emerging trends; **enhance our existing products and services by adding innovative features on a timely and cost-effective basis that differentiates us from our competitors**; **sufficiently capture intellectual property rights in new inventions and other innovations; and develop or acquire and bring products and services, including enhancements, to market quickly and cost-effectively**.

(Bold & italic subheading in original. Bold emphasis added.)

164.    The Registration Statement continued, stating:

In addition, **our competitors may introduce superior products or business strategies**, impairing our brand and the desirability of our products and services, which may cause customers to defer or forego purchases of our products and services, and impacting our ability to charge monthly service fees. **If our competitors implement new technologies before we are able to implement them, those competitors may be able to provide more effective products than ours, possibly at lower prices. Any delay or failure in the introduction of new or enhanced solutions could harm our business, results of operations and financial condition. In addition, the markets for our products and services may not develop or grow as we anticipate**.

(Emphasis added.)

165.    The Registration Statement further described risks related to increased competition and increased pricing pressure or reduced market share that could in the future have a material adverse impact on the Company's business, financial condition, results of operations, and cash flows, stating, in relevant part:

*We may not be able to continue to develop and execute a competitive yet profitable pricing structure.*

We face competition from cable and telecommunications companies that are

actively targeting the home automation and monitored security market, as well as from large technology companies that are expanding into the connected home market either through the development of their own solutions or the acquisition of other companies with home automation solution offerings. **This increased competition could result in pricing pressure, a shift in customer preferences towards the services of these companies, reduce our market share and make it more difficult for us to compete on brand-name recognition and reputation**. Continued pricing pressure from these competitors or failure to achieve pricing based on the competitive advantages previously identified above **could** prevent us from maintaining competitive price points for our products and services resulting in lost customers or in our inability to attract new customers and have a material adverse effect on our business, financial condition, results of operations, and cash flows.

(Bold & italic subheading in original. Bold emphasis added.)

166.    Further, during the IPO roadshow, Defendants Whall, DeVries, and Likosar gave a presentation that included a slide claiming that ADT is a "clear leader" in the residential security market, possessing 30% of that market. The slide attributed the Company's ability to retain market share to "[h]igh barriers to entry," including "significant costs to maintain a nationwide footprint," and "limited new participants" in the market, describing such new participants as mainly consisting of cable and telecommunications companies.

167.    The statements referenced above in ¶¶ 148-166 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants and Apollo Defendants or recklessly disregarded by them. Specifically, the Individual Defendants and Apollo Defendants willfully or recklessly made and/or caused the Company to make omissions of material fact regarding, or make false or misleading statements that failed to disclose: (1) the true nature of ADT's relationship with Zonoff and the Z1 Platform; (2) the disclosure of ADT's proprietary information and code to Ring; (3) known uncertainty associated with the *Zonoff* Litigation; (4) ADT had reached a settlement in the *Zonoff* Litigation

that would allow Ring to use the Z1 Platform, which was built on trade secrets and technology developed by ADT, to compete directly with ADT; (5) ADT's lack of a material foothold in the DIY home security market; (6) competitive challenges faced by ADT, including that: (i) Ring was currently soliciting ADT's customers by marketing its alarm product as a replacement for ADT Pulse; (ii) Ring's market share grab was not speculative; and (iii) that competition had shifted from cable and telecommunication companies to technology companies like Google, Amazon, and Apple; (7) ADT was not a "partner of choice for leading technology companies," as evidenced by Amazon's acquisition of Ring shortly after the IPO; (8) attractive growth opportunities for complementary products and services through partnerships with leading technology firms did not exist, nor would any then current partnership expand ADT's presence into new channels; (9) then-existing factors made the IPO more speculative and risky than the Registration Statement disclosed; (10) the Registration Statement mischaracterized as potential risks a number of material trends and results that were then complete; (11) the estimated ranges for the then-complete 2017 fiscal results in the Registration Statement were unrealistic based on the financial results from the then-completed 2017 fiscal year; (12) the Company failed to maintain internal controls; and (13) as a result of the foregoing, ADT's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

168.    As the IPO was launched on January 19, 2018, the media began reporting that ADT had agreed to relinquish its rights to the Z1 Platform for $25 million dollars, thus allowing Ring to enter the security market with its low price point.

169.     This news placed downward pressure on ADT's stock immediately following the IPO, and shares fell from the $14 IPO price on the very first day of trading, closing at $12.39 on January 19, 2018, a drop of $1.61 or 11.5% from the IPO price.

170.     Allison Prang of Dow Jones Institutional News attributed the Company's poor post-IPO performance to competitive pressures from Ring and other market participants, stating "[p]otential investors had said they were concerned about the company's ability to retain customers and attract new ones amid competition from new entrants including the video-doorbell company Ring."

171.     Other analysts express concern with the disclosures in the Registration Statement. Imperial Capital issued a report on February 13, 2018, noting that the lack of transparency in the Registration Statement:

> *ADT is providing less granular metric transparency* than previous iterations of the company. The market may be less forgiving of "missed" quarters without the ability to investigate individual metrics than before. Ultimately, *we would like to see ADT provide more details in its filings*, including greater divisional data on residential and commercial industrial, average revenue, and cost to serve per subscriber, the take rate of Pulse, performance of the organic ADT business on measures like revenue growth and attrition.

172.     Analyst Shlomo Rosenbaum of Stifel expressed similar concerns, as reported by MarketWatch.com on February 17, 2018:

> Analyst Shlomo Rosenbaum compared what is the same at ADT as compared with when it was public before with what has changed and found it no longer makes certain disclosures that would clearly help understand the state of the underlying business.

> For example, the company used to provide unit and revenue attrition metrics, but now only provides gross customer revenue attrition, he said. Subscriber counts were provided on a quarterly basis in the past, but are not provided at all now.

> "We believe the subscriber base in terms of units has been shrinking," he wrote.

* * *

- 48 -

Gross additions were another feature of quarterly reports with a breakdown of how many came from the dealer channel and how many from the internal channel, said Rosenbaum. The company is no longer providing an update of subscriber acquisition costs. And its debt levels have significantly increased thanks to the LBO, he said.

"Since the key drivers of the business are subscriber acquisition costs, average revenue per subscriber (or recurring monthly revenue, also know[n] as RMR), and attrition, we believe it is tough to gauge what is really going on in the business from public filings," said Rosenbaum[.]

173.    The settlement of the *Zonoff* Litigation was confirmed on February 23, 2018 when a stipulation was filed with the Delaware Court of Chancery vacating the preliminary injunction against Ring.

174.    Shortly after the stipulation was filed, on February 27, 2018, Amazon announced that it had entered into an agreement to buy Ring. News outlets reported a purchase price of $1 billion.

175.    Analysts immediately recognized the threat the Ring-Amazon combination posed to ADT. A February 27, 2018 Wedbush Securities report asserted that ADT could be the "biggest loser" in the acquisition as "camera technology is far superior to physical security . . . With Amazon having 100 million Prime members, it's a big addressable market for them to start selling this into." A February 28, 2018 report from Morgan Stanley noted that if Amazon brought professional monitoring to Ring's home automation products, ADT would be at even greater risk.

176.    On this news, the price of ADT shares fell over 13%, or $1.60 per share, from the closing price on February 26, 2018, closing at $10.55 per share on February 28, 2018.

177.    The Company's first periodic report as a publicly traded entity was highly anticipated by investors. As Barclays noted on March 8, 2018, the firm was looking forward to improved transparency from ADT, as "[a] common complaint during the IPO was not enough disclosure."

178.    On March 15, 2018, before markets opened, ADT issued a press release announcing lackluster financial results for the year and quarter ended December 31, 2017. Despite a one-time $690 million boost from tax reforms, ADT was revealed to be operating at a loss. Excluding the tax benefit and other special items, ADT disclosed diluted earnings per share of negative $0.06 for the quarter and negative $0.35 for the year. In relevant part, the release provided the following results for the year:

> On a full year basis, the Company reported total revenue of $4,316 million and M&S Revenue of $4,029 million, up 4% and 2%, respectively, when compared to 2016 pro forma results. Adjusted EBITDA increased by $176 million, or 8%, to $2,353 million. Net income was $343 million, up from a net loss of $285 million, and diluted earnings per share of $0.53, up from $(0.44) last year. Excluding special items, diluted earnings per share for the year was $(0.35) compared to $(0.20) in 2016. Operating cash flow was $1,592 million, up 39% year-over-year, and free cash flow before special items was $403 million, up from $331 million in 2016.

179.    The press release reported the following results for the quarter:

> The Company reported net income of $638 million, up from negative $85 million last year, and diluted earnings per share of $0.99 versus $(0.13) in the prior year. Excluding special items, diluted earnings per share was $(0.06) versus $(0.07) in the same period last year. The net income results include a $690 million tax benefit due to the 2017 Tax Reform.

180.    On the same day, and prior to market open, ADT hosted an earnings call with analysts and investors. During the call, analysts asked about the threat of new tech offerings and the potential impact of Amazon's acquisition of Ring. Defendant Whall attempted to characterize DIY offering as a "positive," he admitted that while in the past competition was from cable and telecommunications companies, there had been "a change in the competitive landscape." Regarding the new offerings from the tech sector, Defendant Whall acknowledged that Google, Amazon, and Apple were "coming out more on the hardware side and kind of getting things started with a more DIY offering."

181.    Regarding the Company's partnership with Samsung, which was highlighted in the Registration Statement, Defendant Whall stated during the call that it was for "less-sophisticated systems in the DIY market."

182.    Seeing though Defendant Whall's attempts to paint a rosy picture at ADT, analysts continued to note the pressures faced by ADT from the DIY market. Barclays, for example, pondered whether "emerging competitive threats [including from] (Amazon/Ring)" were the cause of ADT's disappointing post IPO performance, and noted that "investor's skittishness tied to the [Amazon] threat does not appear to be going away any time soon."

183.    Analysts expressed concerns with the results. On March 15, 2018, Investor's Business Daily published an article stating the following about what it called "Alarming Numbers" and a "Surprise Loss" at ADT:

> Home security company ADT Inc. (ADT) reported *a surprise adjusted loss* for the fourth quarter, its first quarterly report since coming public in January. . . *Analysts had expected earnings of 14 cents per share* on revenue of $1.09 billion . . . *But ADT lost 6 cents a share excluding one-time items*.

(Emphasis added.)

184.    MarketWatch.com published an article on the same day, summarizing the situation at ADT as follows:

> [T]he company posted *a surprise adjusted loss for the fourth quarter*. ADT said it had net income of $638 million, or 99 cents a share, for the quarter, after a loss of $85 million, or 13 cents a share, in the year-earlier period. The number included a $690 million tax benefit from the December tax revamp. *Excluding special items, however, the company had a loss of 6 cents a share,* while the FactSet consensus was for EPS of 10 cents. The news overshadowed a small revenue beat.

(Emphasis added.)

185.    On this news, the price of ADT shares fell nearly 14.5%, or $1.48 per share, from the closing price on March 14, 2018, closing at $8.73 per share on March 16, 2018.

186.     As of the time of filing this complaint, ADT shares had not traded at or above $14 per share since the IPO.

187.     In breach of their fiduciary duties, the Individual Defendants and Apollo Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

188.     Moreover, the Individual Defendants and Apollo Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

189.     In further breach of their fiduciary duties, the Individual Defendants and Apollo Defendants failed to maintain internal controls.

**Repurchases**

190.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its equity securities at artificially inflated prices that substantially damaged the Company.

191.     The Individual Defendants caused the Company to pay $14.00 per share for 4,203 equity securities from January 19, 2018 to June 30, 2018, for a total cost to the Company of $58,842. As the Company stock was actually only worth $7.56 per share, the price at closing on March 27, 2018, the Company overpaid approximately $27,067 in total for these repurchases.

192.     According to the Company's Form 10-Q filed with the SEC on May 9, 2018, between January 1 and January 31, 2018, the Individual Defendants "approved the repurchase of 4,203 equity securities from two former employees at the initial public offering price of $14.00

per share used in [ADT's] initial public offering," for a total cost to the Company of approximately $58,842.[10]

193.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.44 more than the actual worth of each share during the period of January 1 to January 31, 2016. Thus, the total over payment by the Company for its repurchases of its own equity securities during such period was approximately $27,067.

194.    In total, the Company overpaid an aggregate amount of approximately $27,067 for repurchases of its own equity securities during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO ADT

195.    As a direct and proximate result of the Individual Defendants' and Apollo Defendants conduct, ADT is losing and expending, and will lose and expend, many millions of dollars.

196.    Such expenditures include, but are not limited to, legal fees and payments associated with Federal Securities Class Action filed against the Company, its CEO, its CFO, its CLO, nine current members of its board, one former member of its Board and Apollo, the State Securities Class Action filed against the Company, its CEO, its CFO, its President, nine current members of its Board, one former member of its Board and the Apollo Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

---

[10] Upon information and belief, some, if not all, of these repurchases occurred within the Relevant Period, as evidenced by the fact that the IPO was priced at $14 per share on January 19, 2018.

197.    Such losses include the Company's overpayment by approximately $27,067 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

198.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

199.    As a direct and proximate result of the Individual Defendants' and Apollo Defendants conduct, ADT has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' and Apollo Defendants breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

200.    Plaintiff brings this action derivatively and for the benefit of ADT to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Apollo Defendants' breaches of their fiduciary duties to ADT, unjust enrichment, violations of Section 10(b), Rule 10b-5 and violations of Section 20(a) of the Exchange Act as well as the aiding and abetting thereof.

201.    ADT is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

202.    Plaintiff is, and has been at all relevant times, an ADT shareholder. Plaintiff will adequately and fairly represent the interests of ADT in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

203.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

204.    A pre-suit demand on the Board of ADT is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten individuals, Individual Defendants Whall, Africk, Becker, Drescher, Nord, Press, Rayman, Ryan, and Solomon (the "Director-Defendants") and non-party Matthew E. Winter (collectively, with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the ten Directors who are on the Board at the time this action is commenced.

205.    The Apollo Defendants control the Company, and have designated a majority of the Board. Indeed, the ten director Board has only two members considered to be independent: Director-Defendant Africk and non-party Matthew E. Winter. This is below is the minimum number of independent directors a public company must have in order to comply with SEC and NYSE rules relating to the composition of audit committees. However, SEC and NYSE rules allow the Company one year from January 18, 2018 to meet the independence standards of the Audit Committee.

206.    Six of the Director-Defendants have close business associations with the Apollo Defendants, which collectively control 85.6% of the Company's stock, and which owned 100% of the Company's stock at the time of the IPO. These six Director-Defendants comprised the majority of the 10-director Board at the time of the IPO. Director-Defendants Becker, Drescher, Nord, and Press are Senior Partners at Apollo. Director-Defendant Rayman is a Principal at Apollo. Director-Defendant Solomon is a Senior Partner at Apollo Private Equity. All six of these Director-Defendants were designated to the Board by Apollo. As a result of their employment at and/or

- 55 -

membership with the Apollo Defendants or affiliates thereof, Director-Defendants Becker, Drescher, Nord, Press, Rayman, and Solomon are beholden to the Company's controlling shareholder. The Apollo Defendants face a substantial likelihood of liability as they are named as defendants the State Securities Class Action, and Apollo faces further liability as it is named in the Federal Securities Class Action. Thus, Director-Defendants Becker, Drescher, Nord, Press, Rayman, and Solomon cannot consider a demand to take action against the Apollo Defendants with disinterestedness or independence.

207.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly, to cause the Company to make the false and misleading statements and omissions of material fact while causing the Company to overpay $27,067 for repurchases of its own equity securities, all of which render the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

208.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused the Company to make the materially false and misleading statements alleged herein.

209.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

210.    Additional reasons that demand on Director-Defendant Whall is futile follow. Director-Defendant Whall is CEO and a Company Director, and has served in those positions since 2016, in addition to serving as the CEO of Prime Borrower. ADT provides Defendant Whall with

his principal occupation, and he receives handsome compensation, including over $1.9 million in the fiscal year ended December 31, 2017. Thus, as the Company admits, Defendant Whall a non-independent director. Defendant Whall's large Company stock holding, worth over $6 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director, Defendant Whall conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Whall was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the Registration Statement referenced herein, which he signed and personally made. Furthermore, Defendant Whall is a defendant in both the Federal Securities Class Action and the State Securities Class Action. Director-Defendant Whall's family is also intertwined with the business of ADT: his brother has an ownership interest in Professional Resources International, which the Company has an ongoing agreement to pay $14,000 per month to for staff recruiting services, and an immediate family member of Director-Defendant Whall is a regular full-time employee of ADT in a managerial position, with an annual salary, bonus and benefits of approximately $169,000.[11] Defendant Whall is unable to evaluate a demand with independence as he may fear retaliation against his family members should he grant a demand. Thus, for these reasons, too, Defendant Whall breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

---

[11] This family member was also granted options to acquire approximately 5,555 shares valued at approximately $18,000 on June 29, 2017.

211.   Additional reasons that demand on Director-Defendant Rayman is futile follow. Director-Defendant Rayman has served as a Company director since 2016, and is a member of the Audit Committee. He is beholden to the Apollo Defendants by virtue of his position as a Principal at Apollo, where he has worked since 2010, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015, and thus is unable to fairly and independently assess any demand made upon the Board. He was also designated to his position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Rayman is a non-independent director. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Rayman is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Rayman also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Rayman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.   Additional reasons that demand on Director-Defendant Becker is futile follow. Director-Defendant Becker has served as a Company director since 2016, and serves as Chairman of the Board. He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 1996, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015, and thus is unable to fairly and independently assess any demand made upon the Board. He was also designated to his

position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Becker is a non-independent director. As a director and as Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Becker is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Becker also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Becker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Director-Defendant Press is futile follow. Director-Defendant Press has served as a Company director since 2016. He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 1998, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2016, and thus is unable to fairly and independently assess any demand made upon the Board. He was also designated to his position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Press is a non-independent director. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Press is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Press also was the maker of

many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Press breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Director-Defendant Nord is futile follow. Director-Defendant Nord has served as a Company director since 2016. He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 2003, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015, and thus is unable to fairly and independently assess any demand made upon the Board. He was also designated to his position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Nord is a non-independent director. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Nord is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Nord also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Nord breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Director-Defendant Drescher is futile follow. Director-Defendant Drescher has served as a Company director since 2017. She is beholden to the Apollo Defendants by virtue of her position as Senior Partner of Apollo where she has worked

since 2004, and to ADT and the Apollo Defendants by virtue her position as a manager of Prime Borrower, which she has held since 2017, and thus is unable to fairly and independently assess any demand made upon the Board. She was also designated to her position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Drescher is a non-independent director. As a director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Director-Defendant Drescher is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Drescher also was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the Registration Statement. Thus, for these reasons, Director-Defendant Drescher breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216.    Additional reasons that demand on Director-Defendant Solomon is futile follow. Director-Defendant Solomon has served as a Company director since 2016. He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo Private Equity where he has worked since 2009, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2016, and thus is unable to fairly and independently assess any demand made upon the Board. He was also designated to his position on the Board by Apollo. Thus, as the Company admits, Director-Defendant Solomon is a non-independent director. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. Moreover, Director-Defendant Solomon is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Solomon also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Solomon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Director-Defendant Ryan is futile follow. Director-Defendant Ryan has served as a Company director since 2016. He has further served as a manager of Prime Borrower since 2016, and is thus beholden to ADT and the Apollo Defendants. He was also designated to his position on the Board by "certain investors in [ADT's] indirect parent entities other than Apollo." Thus, as the Company admits, Director-Defendant Ryan is a non-independent director. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Ryan is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Ryan also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Ryan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Director-Defendant Africk is futile follow. Director-Defendant Africk has served as a Company director since 2016, and is a member of the Audit Committee. Director-Defendant Africk receives handsome compensation, including

$100,000 in the fiscal year ended December 31, 2017, and stands to earn twice that amount in the fiscal year ended December 31, 2018. He has further served as a manager of Prime Borrower since 2015, and is thus beholden to ADT and the Apollo Defendants. He is further beholden to the Apollo Defendants by virtue of his history with Apollo, where he worked for 21 years prior to starting his own private investment company in 2013, and thus is unable to fairly and independently assess any demand made upon the Board. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Director-Defendant Africk is a defendant in both the Federal Securities Class Action and State Securities Class Action. Director-Defendant Africk also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. Thus, for these reasons, Director-Defendant Africk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on the Board is futile follow.

220.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by $27,067 for its own equity securities during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the

Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

221.    Director-Defendants Whall and Africk are parties to a limited partnership agreement with TopCo, pursuant to which they own 672,351 and 17,937 Class A-2 Units in TopCo, respectively. These units entitle Director-Defendants Whall and Africk to receive distributions from TopCo in accordance with waterfall provision in the Limited Partnership agreement for TopCo. As Director-Defendants Whall and Africk have a vested financial interest in TopCo, which is a named defendant in both this action and the State Securities Class Action, Director-Defendants Whall and Africk are unable to consider a demand with disinterest or independence, and therefore, demand on them is excused.

222.    Demand in this case is excused because the Directors, nine of whom are named as defendants in this action, the Federal Securities Class Action and the State Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants and Apollo Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' and Apollo Defendants conduct. Thus, any demand on the Directors would be futile.

223.    Many of the Directors have business and personal relationships arising from shared professional engagements outside of ADT. For example:

- All of the Director-Defendants are managers of Prime Borrower, an indirect, wholly-owned subsidiary of ADT, with the exception of Director-Defendant Whall, who

is the CEO and former President of Prime Borrower. In addition, Defendant Likosar is Prime Borrower's CFO and Treasurer.

- Director-Defendants Rayman and Solomon both currently serve on the boards of Redbox Automated Retail LLC, Coinstar, LLC, ecoATM and Mood Media Corporation.

- Director-Defendants Press and Nord both currently serve on the board of RCCH Healthcare Partners, and both served on the Board of Noranda Aluminum Holding Corporation in the past five years.

- Director-Defendants Nord and Becker both served on the boards of Evertec Group, LLC and SourceHOV Holdings, Inc. in the past five years.

- Director-Defendants Press and Raymond both served on the Board of Verso Corporation in the past five years.

- Director-Defendants Press and Becker both served on the Board of Affinion Group Holdings in the lasts five years.

Upon information and belief, these Defendants developed personal and professional connections as a result of their shared experiences at the aforementioned entities, and such personal and professional connections prevent them from evaluating a demand with independence.

224. Director-Defendants Africk and Rayman (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. As articulated in the 2018 Proxy Statement:

> The Board of Directors has an oversight role, as a whole and also at the committee level, in overseeing management of its risks. The Board of Directors regularly reviews information regarding our credit, liquidity, and operations, as well as the risks associated with each. The Compensation Committee is responsible for overseeing the management of risks relating to employee compensation plans and arrangements and the ***Audit Committee of the Board of Directors (the "<u>Audit Committee</u>") oversees the management of financial risks.*** While each committee is responsible for evaluating certain risks, and overseeing the management of such

> risks, the entire Board of Directors is regularly informed through committee reports about such risks.

(Underline in original. Emphasis added in bold & italics). As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

225.    ADT has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ADT any part of the damages ADT suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

226.    The Individual Defendants' and Apollo Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own equity securities, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, such Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

227.    The acts complained of herein constitute violations of fiduciary duties owed by ADT's officers, directors, and/or controlling shareholders, and these acts are incapable of ratification.

228.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of ADT. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ADT, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

229.     If there is no directors' and officers' liability insurance, then the Directors will not cause ADT to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

230.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Whall, Likosar, Becker, Rayman, Nord, Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

231.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.     Defendants Whall, Likosar, Becker, Rayman, Nord, Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney ("Section 10(b) Defendants") participated in a scheme to defraud with the purpose and effect of defrauding ADT. Not only is ADT now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon ADT by the Section 10(b) Defendants. With the price of its common stock trading at artificially-inflated prices due to the Section 10(b) Defendants' misconduct, the Section 10(b) Defendants caused the Company to repurchase approximately $58,842 of its own equity securities at artificially-inflated prices, damaging ADT.

233.     The Section 10(b) Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

234.     The Section 10(b) Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ADT not misleading.

235.     The Section 10(b) Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Section 10(b) Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by ADT.

- 68 -

236.     The Section 10(b) Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Section 10(b) Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

237.     By virtue of the foregoing, the Section 10(b) Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

238.     Plaintiff, on behalf of ADT, has no adequate remedy at law.

## SECOND CLAIM

**Against the Apollo Defendants and all of the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

239.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.     The Individual Defendants and Apollo Defendants, by virtue of their positions with ADT and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ADT and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants and Apollo Defendants had the power and influence and exercised the same to cause ADT to engage in the illegal conduct and practices complained of herein.

241.     Plaintiff, on behalf of ADT, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants and the Apollo Defendants for Breach of Fiduciary Duties**

242.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.    Each Individual Defendant and Apollo Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ADT's business and affairs.

244.    Each of the Individual Defendants and the Apollo Defendants violated and breached his, her, or its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

245.    The Individual Defendants' and Apollo Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and Apollo Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ADT.

246.    The Individual Defendants and Apollo Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

247.    In further breach of their fiduciary duties owed to ADT, the Individual Defendants and Apollo Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact. Specifically, Defendants failed to disclose: (1) the true nature of ADT's relationship with Zonoff and the Z1 Platform; (2) the disclosure of ADT's proprietary information and code to Ring; (3) known uncertainty associated with the *Zonoff* Litigation; (4) ADT had reached a settlement in the *Zonoff* Litigation that would allow Ring to use the Z1 Platform, which was built on trade secrets and technology developed by ADT, to compete

directly with ADT; (5) ADT's lack of a material foothold in the DIY home security market; (6) competitive challenges faced by ADT, including that: (i) Ring was currently soliciting ADT's customers by marketing its alarm product as a replacement for ADT Pulse; (ii) Ring's market share grab was not speculative; and (iii) that competition had shifted from cable and telecommunication companies to technology companies like Google, Amazon, and Apple; (7) ADT was not a "partner of choice for leading technology companies," as evidenced by Amazon's acquisition of Ring shortly after the IPO; (8) attractive growth opportunities for complementary products and services through partnerships with leading technology firms did not exist, nor would any then current partnership expand ADT's presence into new channels; (9) then-existing factors made the IPO more speculative and risky than the Registration Statement disclosed; (10) the Registration Statement mischaracterized as potential risks a number of material trends and results that were then complete; (11) the estimated ranges for the then-complete 2017 fiscal results in the Registration Statement were unrealistic based on the financial results from the then-completed 2017 fiscal year; (12) the Company failed to maintain internal controls; and (13) as a result of the foregoing, ADT's public statements were materially false and misleading at all relevant times.

248.    The Individual Defendants and Apollo Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

249.    In breach of their fiduciary duties the Individual Defendants and Apollo Defendants caused the Company to engage in repurchasing its own equity securities.

250.    The Individual Defendants and Apollo Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to

correct the Company's public statements. The Individual Defendants and Apollo Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ADT's securities.

251.    The Individual Defendants and Apollo Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants and Apollo Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

252.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

253.    As a direct and proximate result of the Individual Defendants' and Apollo Defendants' breaches of their fiduciary obligations, ADT has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Apollo Defendants are liable to the Company.

254.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants and the Apollo Defendants for Unjust Enrichment

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Apollo Defendants were unjustly enriched at the expense of, and to the detriment of, ADT.

257.    The Individual Defendants and Apollo Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ADT that was tied to the performance or artificially inflated valuation of ADT, or received compensation that was unjust in light of the Individual Defendants and Apollo Defendants' bad faith conduct.

258.    Plaintiff, as a shareholder and a representative of ADT, seeks restitution from the Individual Defendants and Apollo Defendants and seeks an order from this Court disgorging all profits—including from benefits and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants and Apollo Defendants due to their wrongful conduct and breach of their fiduciary duties.

259.    Plaintiff, on behalf of ADT, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants and Apollo Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of ADT, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that each of the Individual Defendants and Apollo Defendants breached or aided and abetted the breach of their fiduciary duties to ADT;

(c)      Determining and awarding to ADT the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Apollo Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing ADT and the Individual Defendants and Apollo Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ADT and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of ADT to nominate at least five candidates for election to the board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding ADT restitution from Individual Defendants and Apollo Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

- 74 -

(g) Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 12, 2018               Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq.
Fla. Bar No. 0182877
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

- 75 -

DocuSign Envelope ID: 1E27DCBF-7812-490B-874D-BBC735996EB1

## VERIFICATION

I, Mitch Velasco am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __ th day of September 2018.

9/9/2018 1:35:05 PM PDT

DocuSigned by:

1CF5B1B977244DD...

Mitch Velasco